JOHN GUTHRIE V. TEXAS EMPLOYERS INSURANCE ASSOCIATION.

No. A-1200. Decided July 9, 1947.
(203 S. W., 2d Series, 775.)

*Cunningham & Boling* and *Jimmie Cunningham,* all of Lubbock, for petitioner.

*Underwood, Johnson, Dooley & Wilson,* and *R. A. Wilson,* all of Amarillo, for respondent.

MR. JUSTICE TAYLOR delivered the opinion of the Court.

John Guthrie sued Texas Employers Insurance Association, compensation insurance carrier for Postex Cotton Mills, for compensation at the rate provided under the terms of the compensation carrier's policy. He alleged that on December 2, 1944, in the course of his regular duties as an employee for Postex Mill, he was accidently injured while performing his duties as such employee.

The court of civil appeals, on the ground that there was no evidence tending to show that the plaintiff sustained a compensable injury, affirmed an instructed verdict by the trial judge in favor of the association. 199 S. W. (2d) 685. The writ was granted on petitioner's point alleging that the court of civil appeals erred in holding there was no evidence to raise such a fact issue. Upon full consideration of the cause we have concluded that the view entertained by us at the time the writ was granted, is correct. Bryant v. Continental Casualty Co., 107 Texas 582, 182 S. W. 673, L. R. A. 1916E, 945; Ann. Cas. 1918A, 517; Security Union Casualty Co. v. O'Pry (Com. App.), 1 S. W. (2d) 590; reversing id., 294 S. W. 606; Hebert Casualty Co. v. New Amsterdam Cas. Co., (Com. App.), 1 S. W. (2d) 608; Lumbermen's Recip. Ass'n. v. Behnken, 112 Texas 103, 246 S. W. 22, 28 A. L. R. 1402; Seaboard Life Ins. Co. v. Murphy, 134 Texas 165, 169, 132 S. W. (2d) 393, loc. cit. (2d) 395; Safety Cas. Co. v. O'Pry, 187 S. W. (2d) 578, (R. W. M.) Maryland Cas. Co. v. Rogers, 86 S. W. (2d) 867, (wr. ref.), loc. cits. (3) and (5) pp. 870-1; Traders & Gen. Ins. Co. v. Wright 144 S. W. (2d) 626, loc. cit. (3) pp. 627-8, writ refused.

John Guthrie, who was about 30 years old prior to becoming an employee of the Cotton Mill, had worked steadily in various kinds of employment, including employment in C. C. Camps, and for the Katy railroad in 1940. In connection with both of these employments he had had physical examinations. When employed by the Mill he was assigned to work as one of the clean-up hands in a weave room in which 230 looms were operated. The room was heated with steam and kept closed tight. Those working

there (about 20 or 30 persons) were not permitted to cut down the steam. There was much dust in the room, which was blown off from the looms with air hoses. The mist or humidity from the steam was supposed to keep the dust and fuzz settled, but it was hard to keep it cleared up. Two workmen had got too hot in the room on prior occasions and fallen out from the heat. Bill Hughes was foreman of the room. There was a way to cut the steam down but Hughes did not permit the other employees to do it. Air hoses were used to blow off the "fuzz and stuff" and this was what created the large amount of dust, difficult to keep down at any time. On December 2, 1944, when Guthrie felt he had become too hot he requested Bill Hughes to cut the steam but Hughes refused. Hughes did not testify. The room, Guthrie said, seemed hotter than it had ever been before. He was sick at his stomach, vomited, went outside for about thirty minutes, and got a chill. He came back in the room and worked till noon, but has never felt good since. He did not work that Saturday afternoon, according to the custom of the Mill. Mrs. Guthrie said that when he came home he looked like a sick man, and was bleeding at the nose, which continued through the night. Guthrie's father-in-law, Mr. Snow, said "it got awaful hot" that morning and that he himself was almost too hot; that Guthrie came to him and said he was getting too hot and he replied that he (Snow) would "try to make it on till noon." Guthrie said he later began to cough and his condition continued to get worse until February or March, 1946. That was when he first suspected he had tuberculosis; that he was admitted to the State Sanitorium near San Angelo where he remained from March 16th to June 26th. He followed the rest schedule provided for him there and continued to follow it after he came home. He had had colds before, he said, but what he had after he got too hot that day seemed to be a cold he could not get rid of, and it continued until he went to the hospital.

Dr. Edwards, who first saw Guthrie in March 1946, testified that getting overheated lowered one's resistance and that he could get heat exhaustion then; that heat exhaustion has a tendency to make a person ill and that sometimes he will pass out, according to his resistance; that vomiting and nose-bleed were symptoms of heat exhaustion; that cooling off too quickly after being hot is a usual cause of colds. The following hypothetical question was addressed to Dr. Edwards:

"Assuming * * * that Mr. Guthrie was working in a room that was kept at a warm or extremely warm temperatoure and assuming that at a particular time this room became overheated

to such an extent that he became nauseated and threw up, and * * * went out into the cold December air in order to get fresh air, and he immediately became chilled through and started to cough * * *, would that condition be calculated to irritate the lungs or lower the resistance of the body to such an extent that if there were tuberculosis germs that they would become active?"

His answer was that "it certainly would." He said also that a person who became nauseated in an overheated room would be apt to have nose bleed, and vomit, on account of the high temperature; that he had examined Guthrie several times and taken X-ray pictures and found him with an arrested case of tuberculosis (apparent from the pictures) ; and that at the present time, while his case was not active, it could become so again.

Dr. Logan, who examined Guthrie on July 16, 1946, expressed himself to the same effect that Dr. Edwards did in response to the above hypothetical question; and further said the symptoms of tuberculosis would not necessarily appear immediately after one became overheated; that one's exposure to excessive heat and then sudden exposure to cold, would be calculated to weaken the system and that any condition that would lower the vitality would make him susceptible to tuberculosis.

Guthrie returned to work the following Monday morning, after he became too hot on Saturday, December 2, 1945. He worked about an hour when his nose started bleeding and he could not get it to quit. He went to Dr. Williams who stopped it. After that he laid off two days. During that month (December) he lost four days from work and although he did not feel well, continued to work through January and February and until the army called him. Mrs. Guthrie said he went to San Angelo and stayed three weeks; and that he had been following the rest schedule consistently since his return from there. Guthrie said that what seemed to be a cold after cooling off when he left the weave room was different from any cold he had had before; that his lungs began wheezing that night; that at the time he had the symptoms of nausea and vomiting referred to there was more heat present than the general public is ordinarily exposed to.

The court of civil appeals in the O'Pry case (294 S. W. 606) held on substantially parallel facts that the injured employee was not entitled to recover, resting its decision on Tex. Emp. Ins. Ass'n. v. Jackson (Com. App.), 265 S. W. 1027 and Aetna

Life Ins. Co. v. Graham (Com. App.), 284 S. W. 931. The Supreme Court (Com. App. 1 S. W. (2d) 590) reversed the court of civil appeals holding, saying that it was settled by the Bryant case that the fact of "bodily injury" is shown when heat exhaustion is shown. It held, in brief, "that 'heat exhaustion' itself being an injury, O'Pry must be regarded (in deference to the jury finding and supporting evidence) *as having a degree of industrial incapacity traceable through intermediate disease to that injury and hence to causative danger in the work and premises."* (Italics ours).

There is no evidence that Guthrie's condition was a confining one that had accumulated over a period of time, but is traceable to definite time, place and cause. That the heat exhaustion sustained was an accident, is equally as well settled as that heat stroke, or heat exhaustion, is a bodily injury. The Bryant case; International Trav. Ass'n. v. Francis, 119 Texas 1, 23 S. W. (2d) 282; Pledger v. Business Men's Accident Ass'n. (Com. App.), 228 S. W. 110; Cooley's Briefs on Insurance (2d) Vol. 6, p. 5234.

Petitioner referred correctly to the lack of harmony between the opinion of the Galveston Court of Civil Appeals in Texas Employers Ins. Co. v. Moore, 279 S. W. 516 and the opinion in the case at bar, pointing out that the Galveston Court said Moore, when stricken, *"was not being subjected to no greater hazard than the general public, but on the contrary was localized in an underground basement, much hotter and more trying to work in than would have been the natural and unrestricted atmosphere of the outside."* (Italics ours.)

The court of civil appeals erred in the present case in its conclusion that there was no evidence to raise the fact issue of whether Guthrie sustained a compensable injury. The following cases cited by the court of civil appeals in support of the conclusion do not sustain such holding: Southern Casualty Co. v. Flores, 1 S. W. (2d) 260; Texas Employers' Ins. Ass'n. v. Jackson, 265 S. W. 1027; Hebert v. New Amsterdam Casualty Co. 1 S. W. (2d) 608; Lumbermen's Mut. Casualty Co. v. Vaughn, 174 S. W. (2d) 1001; Maryland Casualty Co. v. Clark, (dism. judg. cor), 140 S. W. (2d) 890.

The Flores and Jackson cases are readily distinguishable from the present case in that the injuries of the respective claimants came from hazards not peculiar to their respective employments but were such as they, along with the general public,

were exposed to. The opinion of the court of civil appeals in the O'Pry case (which relied on the Jackson case along with Aetna Life Ins. Co. v. Graham, supra) was specifically overturned in the later O'Pry case (1 S. W. (2d) 590) on the basis of the holding by the Supreme Court in Bryant v. Casualty Co., supra.

In the Clark case merely the result was approved by this court. While the ventilation was poor, there were open windows in the room where Clark worked. No contention was made that he suffered heat stroke, or heat prostration, but only that he received an injury to the lungs and air passages.

The Hebert case, instead of supporting the view of respondent, is directly in point in support of petitioner's view. The same judge of Section B of the Commisison wrote both the O'Pry and Hebert cases, which were handed down by the Supreme Court on the same day. The holding in the O'Pry case has already been stated. The following (the same in effect as in the O'Pry case) is the concluding paragraph of the Hebert case:

"It was his (Hebert's) business to load (with the aid of various devices) heavy logs onto a wagon, and the locus of his duties was within a forest and *at a point where the sun's heat as it struck his body may have been intensified* (rather, its amelioration prevented) *by the nature of the premises*. We have no warrant, then to say, *as a matter of law*, that his death (through 'heat stroke') is not traceable to *causative danger in the employment*—as, in fact, the jury found it was." (Italics ours.)

The Vaughn case did not reach this Court. The full facts are not before us. Suffice it to say that if its holding runs in any wise counter to that of the Bryant case and the long line of cases following it (only a few of which are cited in this opinion) it is not authoritative.

The contentions of respondent made in its counterpoints presented in the court of civil appeals in support of its holding with respect to the trial court's rulings on objections to certain hypothetical questions propounded to Dr. Edwards, are overruled by what is said above in sustaining petitioner's points in his application for the writ. The evidence excluded in virtue of the trial court's rulings had direct bearing on the principal question in the case, that is, whether or not Guthrie sustained compensable injury as alleged. The court of civil appeals erred in upholding the rulings.

The judgment of the court of civil appeals affirming that of the trial court is reversed and set aside, and the cause is remanded to the trial court for a new trial. It is so ordered.

Opinion delivered July 9, 1947.

No motion for rehearing filed.