William A. OSWALD, Jr., Appellant,

v.

TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellee.

No. 9788.

Court of Appeals of Texas, Texarkana.

April 10, 1990.

Rehearing Overruled May 16, 1990.

David J. Potter, Texarkana, for appellant.

John R. Mercy, Atchley, Russell, Waldrop & Hlavinka, Texarkana, for appellee.

GRANT, Justice.

William A. Oswald, Jr. appeals his workers' compensation case because he was not found to be totally incapacitated. Oswald contends that the trial court erred by denying his motion for directed verdict and for judgment non obstante veredicto because the evidence establishes conclusively that his injury rendered him totally incapacitated. Alternatively, he contends that the trial court erred in denying his motion for a new trial because the jury's verdict was against the great weight and preponderance of the evidence.

On December 3, 1985, while employed as a janitor at Newcourt, Inc., Oswald was collecting fifty-five gallon barrels of trash, moving them to a dumpster by the use of a two-wheel dolly, picking up the barrels without assistance and dumping them into a dumpster. He had been emptying the barrels throughout his six-month employment without incident. Oswald estimated the weight of the barrels to be from 100 to 175 pounds. On the occasion in question, as Oswald picked up a barrel, he felt pain going down both legs all the way to his heels and up to his shoulders. Oswald was forty-two years of age at the time of the injury. He is a man of limited education and has held jobs requiring strenuous manual labor for most of his working life.

The jury was instructed that Texas Employers' Insurance Association admitted that Oswald sustained an accidental injury during the course and scope of his employment with Newcourt. The jury was then asked if the injury was a producing cause of any total incapacity. The jury answered that it was not. The jury found that the injury was a producing cause of a partial incapacity beginning on November 28, 1985, and that the partial incapacity was permanent. The jury found that after Oswald became partially incapacitated, he had an average weekly earning capacity of $200 per week. The jury answered "No" to the question asking whether Oswald's compensation in weekly installments instead of a lump sum would result in a manifest hardship to him.

Oswald contends that the trial court erred in failing to grant him an instructed verdict and a judgment n.o.v. because the evidence conclusively establishes that he was totally incapacitated by his injury.

When the trier of fact returns negative findings to issues upon which the proponent has the burden of proof, the negative findings need not be supported by affirmative evidence and, on appeal, the party having the burden of proof is placed in the position of having to contend that the evidence established the issue as a matter of law or that the duties are against the great weight and preponderance of the evidence. *Copeland Well Service, Inc. v. Shell Oil Co.*, 528 S.W.2d 317 (Tex.Civ.App.—Tyler 1975, writ dism'd). The plaintiff is not entitled to a judgment n.o.v. or an instructed verdict unless the facts were conclusively established in his favor. *Morris v. Brown*, 337 S.W.2d 759 (Tex.Civ.App.–Eastland 1960, no writ). An instructed verdict or a judgment n.o.v. is proper only under very limited circumstances. An issue is conclusively established when the evidence is such that there is no room for ordinary minds to differ as to the conclusion to be drawn from it. *Triton Oil & Gas Corp. v. Marine Contractors*, 644 S.W.2d 443 (Tex.1982).

■ Oswald points to Texas Employers' Indemnity Company's answer to an interrogatory * concerning total incapacity as one factor in establishing a period of total incapacity:

32. Does the Defendant admit that Plaintiff sustained *some period of total*

---

* This was one of a number of interrogatories sent to the defendant. It is so entitled and cites Tex.R.Civ.P. 168. It was not sent as a request for admission pursuant to Tex.R.Civ.P. 169.

*incapacity* (as that term is used in the Workmen's Compensation Law) as a result of an injury sustained on the above date while working for the above-named employer?

a. If not, state in detail each basis on which the Defendant denies that Plaintiff sustained some period of total incapacity following the above listed date.

b. If so, based on all information available to the Defendant, including its medical records, on what date does Defendant contend that such period of total incapacity has or will end?

Answer: Yes

Supplemental answers to the interrogatories, dated October 4, 1988, included the following:

32. The period of total incapacity ended pursuant to Dr. Zum Brunnen's report dated 12–29–87.

Interrogatories which are not offered and admitted into evidence cannot be considered as evidence. *Cornell v. Cornell,* 570 S.W.2d 22 (Tex.Civ.App.–San Antonio 1978, no writ); *Sammons Enterprises, Inc. v. Manley,* 540 S.W.2d 751 (Tex.Civ. App.–Texarkana 1976, writ ref'd n.r.e.). Furthermore, the answer to an interrogatory does not have the effect of the answer to a request for an admission. *Standard Fire Insurance Company v. Ratcliff,* 537 S.W.2d 355 (Tex.Civ.App.–Waco 1976, no writ). Oswald has not cited, and we have been unable to locate, any place in the record where this interrogatory and its answer were introduced into evidence. Therefore, the answer to this interrogatory has no evidentiary value, and we cannot consider it in our review.

After reviewing the evidence, we find no error in the trial court's refusal to grant a judgment n.o.v. or an instructed verdict because Oswald has not shown us that he is entitled to judgment as a matter of law.

■ We next address Oswald's contention concerning the verdict being against the great weight and preponderance of the evidence. In determining a great weight point, the court must consider all the evidence and remand if the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). Oswald specifically contends that the jury's finding that there was no period of total disability was against the great weight and preponderance of the evidence. We agree. When reversing a case on the basis that a jury finding was against the great weight and preponderance of the evidence, this Court is required to detail the evidence or state why contrary evidence greatly outweighed the supporting evidence. *INA of Texas v. Briscoe,* 780 S.W.2d 786 (Tex.1989).

Oswald was hospitalized eight different times with his back problem after the injury in 1985 for a total of fifty-five days in the hospital. Surgery was conducted to perform a posterior lateral fusion using bone from Oswald's pelvic area. In a second operation, the nerves were re-examined and decompressed. An interbody fusion was then performed and plates set across the vertebra to add strength to the L–5 area by installing a bone graft in the space between the vertebra which originally contained the disc. This operation is called a posterior lumbar interbody fusion. Bone was secured from the bone bank to place in Oswald's spine. The bone bank procures bones from deceased people, prepares them in a proper way and cuts them in the approximate size needed.

During the operation, two metal straps were secured to the vertebra by screws. Another bone was placed on the front side of the spine next to the abdomen, wedged between the vertebra in place of the disc. This operation restricts flexibility and makes the joint stiff and rigid, and Oswald was required to wear a back brace for six months.

In *Weicher v. Insurance Co. of North America,* 434 S.W.2d 104, 106 (Tex.1968), the claimant was hospitalized for fifteen days. The court said, "This alone constitutes evidence of disability for at least a given compensable period." In the case of *Seeton v. Aetna Casualty & Surety Co.,* 535 S.W.2d 783 (Tex.Civ.App.–Eastland 1976, no writ), the court held that a finding that a claimant did not sustain any total

incapacity was against the great weight and preponderance of the evidence where the claimant was in the hospital for twenty-seven days following an operation for a herniated disc.

The insurance carrier rightly contends that there is testimony concerning injuries that occurred after the injury at Newcourt which may have been responsible for a portion of Oswald's subsequent disability. We agree. Dr. Zum Brunnen testified that Oswald subsequently injured his back while wiring his house in February of 1987, that he again injured his back while changing a tire on his car in April of 1987 and that he again injured his back while lifting a trailer tongue in December 1987. These injuries could certainly have contributed to Oswald's disability during 1987 and thereafter, but Oswald spent thirty-three days in the hospital prior to 1987, and these injuries could not be attributable to that time frame.

In the present case, *total incapacity* was defined for the jury as meaning one who is disabled from performing the usual tasks of a workman, not merely the usual tasks of any particular trade or occupation, to such an extent that he cannot get and keep employment. The record indicates that Oswald was not capable of securing and holding employment for performing physical labor to such an extent that, for some period of time, he was totally incapacitated.

Texas Employers' Insurance Association does not argue that Oswald was incapable of securing and holding employment or performing physical labor for a period of time. Instead, the Company takes the position that the lifting incident at Newcourt was not a producing cause of any total incapacity because it was solely caused by spondylolisthesis. The Company relies primarily on the testimony of Dr. Norris Knight to support this position.

Ten years earlier, Oswald had sought medical care for back injuries that occurred in 1974 while moving a pipe during his employment by North American Car Corporation. Dr. Norris Knight diagnosed him at that time as having grade one spondylolisthesis at the fifth lumbar vertebra, the lowest movable vertebra in the spine.

Spondylolisthesis is a forward displacement of one vertebra over another. Grade one is the least severe of the different degrees of spondylolisthesis. Its occurrence is generally hereditary and is present in approximately two percent of the population. Although the condition usually develops around age seven, it does not become symptomatic until the person reaches his thirties. Most of the people who have trouble with spondylolisthesis are manual laborers. When a person has this disease, an aggravation can occur when the back is strained. The strain puts a stretch on the nerves that extend from the spinal area through very close tolerances. The stretch can cause swelling around the nerves and pain in the legs.

After having made this diagnosis, Dr. Knight instituted conservative treatment which consisted mainly of muscle relaxers, appropriate pain medications, physical therapy during the acute phase and then muscle re-education, proper lifting techniques, and if need be, operative treatment. Dr. Knight also recommended that Oswald's occupation should not require lifting objects over thirty pounds or frequent bending, stooping, twisting, or prolonged standing.

Texas Employers' Insurance Association strongly contends that the 1974 back injury at North American Car Corporation was responsible for a large portion of Oswald's condition, but the jury made a finding that Oswald's 1974 injury did not contribute to Oswald's incapacity. This finding is unchallenged on appeal.

For approximately ten years, Oswald continued to work at jobs requiring physical exertion but did not go back to Dr. Knight for further treatment until the 1985 injury.

Dr. Knight testified concerning the 1985 lifting incident as follows:

A ... It [spondylolisthesis] actually develops usually around age seven, but people don't normally become symptomatic until they get into their thirties. The reason for that is that early in life the ligaments and muscles are very strong and only in later life, when the

muscle and ligament tissue ages a bit and loses some of its strength and elasticity, do the symptoms start.

Q Tell me if I am correct in saying that with a person like Mr. Oswald, he had this occasion and at some time in his thirties he was going to start having pain or back problems.

A Right. The vast majority of people do start in the thirties and forties with symptoms. Most of the people who have most of the trouble with spondylolisthesis are manual laborers, because of the nature of the occupation. That was true in Mr. Oswald. I think he was predestined from his disease to start at some point in time having symptoms.

. . . .

Q What anatomical changes had taken place in his back when he saw you in 1985, if any?

A The only difference is that in that ten-year period of time he had developed degenerative disc disease in the fifth lumbar disc, and that follows as a sequence to the spondylolisthesis. Essentially, with the abnormal movement, abnormal forces on the lower disc, the cause of the spondylolisthesis, the fifth lumbar disc is more susceptible to degeneration because of the increased forces on it. In fact, Mr. Oswald had developed some degenerative changes in the disc over the years that I hadn't seen.

. . . .

Q Doctor, the incident he related to you, lifting barrels at Newcourt, would that have caused the degenerative changes you saw in Mr. Oswald in 1985?

A No, those degenerative changes are a result of the natural progression of the disease. It doesn't have anything to do with that injury.

. . . .

Q In all the testing that you did of Mr. Oswald did you find any evidence of an injury to Mr. Oswald that would have occurred in that lifting incident while working at Newcourt?

A There actually is nothing from his physical examination or his x-rays, including his myelogram, that one could

pinpoint and say that that specifically came from that one injury. The whole pattern that he has is a result of the spondylolisthesis, and his work history.

Q In that answer I guess you have kind of done it, but can you give a percentage of his problem that is due to the spondylolisthesis, as opposed to any other factor?

A I believe that the whole basic scenario, the whole basic problem, all of his problem, is a direct result of the spondylolisthesis, all that is.

Q So percentage-wise, you would say?

A One hundred percent.

■■■■ A pre-existing condition or bodily infirmity must be the sole cause of the present disability or incapacity or it is no defense. *Bituminous Cas. Corp. v. Martin*, 478 S.W.2d 206 (Tex.Civ.App.–El Paso 1972, writ ref'd n.r.e.). An employee is entitled to compensation for an injury received in the course of employment, regardless of the fact that he may have been suffering from a disease which contributed to that incapacity from injury. *Texas Employers' Insurance Association v. Gallegos*, 415 S.W.2d 708 (Tex.Civ.App.–San Antonio 1967, no writ). It has been recognized that the aggravation of spondylolisthesis by lifting can cause a permanent total incapacity which is compensable under workers' compensation. *Texas Employers' Insurance Association v. Thornton*, 556 S.W.2d 393 (Tex.Civ.App.–Fort Worth 1977, no writ). It is not necessary that an injury be the sole cause of a claimant's incapacity for the claimant to recover on the basis of total and permanent disability. *Travelers Insurance Co. v. Meyer*, 392 S.W.2d 520 (Tex.Civ.App.–Beaumont 1965, writ ref'd n.r.e.). Dr. Knight's testimony does not totally negate the lifting incident as an aggravation to the spondylolisthesis condition. He testified as follows:

Q Doctor, on that point, while you are talking about it, your report of December 5, 1985, mentions that he [Oswald] had an acute exacerbation of this spondylolisthesis, and I would like for you, in all fairness to the jury, and I understand

that perhaps they have never heard of this inquiry, but tell them what part lifting a two hundred-pound barrel would have on a condition that this man would have?

A I think what the acute exacerbation means is that the patient apparently was functioning to some extent, he had pain all these years; but when he lifted that or moved the barrel—I don't know if he lifted it or moved it, but anyway, he had an acute exacerbation. That means he suddenly got worse, symptomatically got worse. He began having more pain. That is what brought him in for me to see him again, was that acute increase in pain as a result of moving the barrel.

. . . .

Q What causes the symptoms to get worse? Identify the symptoms, please.

A The symptoms were pain in his back, with some discomfort into the legs.

Q What causes the pain?

A The spondylolisthesis.

Q Specifically, when he picked up a heavy object, in this case a barrel, as we understand it, what physically happened to cause pain?

A I don't know exactly. It is impossible to know exactly what happened, but because he does have an anatomical weakness in this area, exceeding the structural limits caused the symptoms to start. But as far as identifying one specific structure in there and saying, 'this came apart,' you just can't do that.

Q But does a muscle stretch, or does a ligament get involved, or what actually causes pain? Would it be inflammation of muscles, or what?

A I don't know exactly what structure is in there. We know that with the spondylolisthesis there is no stability there, as it should be. There is abnormal movement in the last disc. There is stress on the last disc. In this particular incident it is impossible to know whether he pulled a muscle, or whether he stretched a ligament or whether he tore a muscle or he tore a ligament. We

don't have any way of identifying individual structures that way.

. . . .

Q So whatever exacerbation entails, and whatever physical problems it causes, it does cause pain, whether it is muscles—and we don't know what, as you have testified, it did incapacitate him to return to any kind of duty that he was doing out there at the workplace?

A I think the two months that I saw him, he was not able to work.

Dr. Zum Brunnen characterized Oswald's injury as being a back injury superimposed upon a condition of spondylolisthesis. The insurance carrier points to Dr. Zum Brunnen's characterization that Oswald had an eighteen percent impairment rating as a result of the injury to show that for no period of time did he have a total disability. Dr. Zum Brunnen testified to an impairment rating of eighteen percent of a permanent nature. However, this percentage was not based upon the test for determining total disability under workers' compensation. To that issue, Dr. Zum Brunnen testified that in his opinion Oswald would be incapacitated for at least 401 weeks from the time of his initial injury and would be unable to get or keep employment and do the usual task of a worker. He described the superimposed injury as being a back strain which made the spondylolisthesis symptomatic.

Q Are there people with that condition who work every day and labor, as this man has been laboring, without symptoms, without pain, without disability?

A Yes.

Q What happens with a person with this pre-existing condition that then causes a disabling condition to arise?

A Well, we figure that it's a strain to the area that can put a stretch on the nerves that are leaving the spinal area through a very—under very close tolerances that can stretch them and cause swelling around the nerves and cause pain in the legs. It just kind of stirs up a hornet's nest, so to speak.

. . . .

Q   Had this back injury not occurred, then he [Oswald] would not have these limitations on his work, such as lack of bending, twisting, lifting, stooping and so forth?

A   Well, provided he hadn't had that injury or any other injury, provided he was just as he was, then I wouldn't see any reason why he would be so limited at this time, because he is a relatively young man.

Q   May I conclude then that the reason for the disability, and what you have termed a permanent disability from returning to a laboring task, is that solely because of his physical condition caused by this on the job injury?

A   I'll say solely, I think, yes.

The insurance carrier points to testimony by Dr. Zum Brunnen with regard to a phenomenon known as symptom magnification.   According to Dr. Zum Brunnen, sometimes patients who are involved in ongoing litigation have a tendency to exacerbate or increase their complaints to their treating physicians.   There was no showing that this was applicable to Oswald, and Dr. Zum Brunnen was not asked if Oswald was suffering from this phenomenon.   The mere fact that this sometimes exists does not prove that it should be applied to Oswald.

■   The testimony of both doctors confirms the pre-existing condition of spondylolisthesis.   Both doctors agree that the on-the-job injury produced symptomatic pain.   Pain is not compensable under the Workers' Compensation Act, but to the extent pain is debilitating and prevents work performance, it can be considered in determining if there is an incapacity.   Up to the time of this injury, he had been able to perform all of the duties required of him in his job.   There is medical evidence that the on-the-job injury aggravated the pre-existing condition, and there is no evidence to the contrary.   Although Dr. Knight testified that the basic problem is a one hundred percent direct result of spondylolisthesis, he further testified that the spondylolisthesis was acutely exacerbated by the lifting incident and that he did not know

specifically whether a muscle or ligament was stretched or torn.   Dr. Zum Brunnen testified that the lifting caused a back strain and that that injury was the sole cause of his disability.   The jury found that Oswald's 1974 injury did not contribute to the incapacity, and there was no evidence of any injury after the injury at Newcourt until 1987.   We conclude that the great weight and preponderance of the evidence shows that the on-the-job injury was one of the producing causes of total incapacity for some time period between December 3, 1985, and February, 1987.   We do not address Oswald's contentions that other jury findings were against the great weight and preponderance of the evidence, because our ruling on this point is dispositive of the case.

We reverse and remand this cause for a new trial.

### ON MOTION FOR REHEARING

On the Motion for Rehearing, the insurance carrier continues to urge strongly that Oswald was totally disabled prior to this injury and that the prior incapacity was the sole cause of any total incapacity.   The insurance association did not contest the fact that there was an injury as defined under the workers' compensation law during the course and scope of Oswald's employment.   Injury was properly defined for the jury as follows:

> "INJURY" means damage or harm to the physical structure of the body and such diseases or infection as naturally result therefrom, *or the excitement, acceleration, or aggravation of any disease, infirmity, or condition,* previously or subsequently existing, by reason of such damage or harm.

(Emphasis added.)

The jury was also given the appropriate definition of producing cause:

> "PRODUCING CAUSE" means an injury or condition which, either independently *or together with one or more other injuries or conditions,* results in inca-

pacity, and without which such incapacity would not have occurred when it did. (Emphasis added.)

The only evidence before the court as to bodily injury concerned the condition of Oswald's back. Two medical experts testified. Dr. Zum Brunnen testified that Oswald's inability to work was solely because of the on-the-job injury. The carrier's expert, Dr. Knight, testified that the on-the-job injury acutely exacerbated Oswald's spondylolisthesis condition and that the injury incapacitated him to the extent that he could not return to any kind of duty at the work place for two months.

When taken with the proper legal definition, this evidence, along with the evidence of Oswald's hospitalization, negates the carrier's argument that prior injuries and the spondylolisthesis condition were the sole cause of any total disability.

On motion for rehearing, the insurance carrier correctly states that the jury finding that the prior injury had not contributed to Oswald's incapacity was limited to the incapacity found by the jury. The specific language of the jury question was as follows:

> Do you find from a preponderance of the evidence that Plaintiff's injury of February 1974, if any, when working for North American Car Corporation, *has not contributed to the incapacity found by you?*

(Emphasis added.)

The carrier contends that since the jury only found partial incapacity in their previous answer, this finding would not cover other bodily conditions that might exist in addition to this partial incapacity. However, we have found that the finding that there was no total incapacity for even a short interval after the injury while Oswald was in the hospital was against the great weight and preponderance of the evidence. Both medical experts agree that there was some period of time when Oswald was not able to perform any of his duties as a worker. Both experts have agreed that the on-the-job injury contributed to that incapacity. Under the Workers' Compensation Act, Oswald is entitled to compensation for total disability for this period of time even if prior injuries and Oswald's back condition were also producing causes of this disability.

The motion for rehearing is overruled.